NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0173n.06

**No. 12-1984**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| FLYING DOG BREWERY, LLLP, | ) | **FILED** |
| | ) | Mar 05, 2015 |
| Plaintiff – Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| MICHIGAN LIQUOR CONTROL | ) | |
| COMMISSION; NIDA SAMONA; | ) | |
| DONALD WEATHERSPOON; PATRICK | ) | |
| GAGLIARDI; COLLEEN POBUR; | ) | OPINION |
| EDWARD GAFFNEY, | ) | |
| | ) | |
| Defendants – Appellees. | ) | |
| | ) | |

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. This appeal arises from Flying Dog Brewery's allegation that its First Amendment rights were violated when the members of the Michigan Liquor Control Commission initially denied Flying Dog's application to register a beer label in Michigan. Flying Dog sued under 42 U.S.C. § 1983, alleging a violation of its First Amendment rights, and the case ultimately proceeded on a claim for damages. The district court granted summary judgment in favor of the Commissioners, extending to them both quasi-judicial and qualified immunity. *Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 870 F. Supp. 2d 477 (W.D. Mich. 2012). Flying Dog now appeals. For the reasons explained below, we REVERSE the judgment of the district court and remand for further proceedings.

## I.  BACKGROUND

Craft beer maker Flying Dog Brewery created a Belgian-style India Pale Ale, "Raging Bitch," in celebration of its twentieth anniversary.  (R. 1 at Page ID 5, ¶ 16.)  In manufacturing this and other craft beers, Flying Dog's co-founder, George Stranahan, was influenced by his friend, "the iconoclastic journalist and literary figure Hunter S. Thompson."  Flying Dog claims that its products are "inextricably imbued with and promote[] the irreverent 'gonzo' spirit and outlook for which Thompson is noted."  (R. 1 at Page ID 3, ¶¶ 10-11.)  Ralph Steadman, an artist with whom Thompson frequently collaborated, also worked with Flying Dog in the production of brewery-related products, including beer labels.  (R. 1 at Page ID 4, ¶ 13.)  The label for "Raging Bitch" beer depicts a wild dog presenting human female genitalia as well as possessing semblances of human female breasts.  The label is inscribed:

> Two inflammatory words . . . one wild drink.  Nectar imprisoned in a bottle.  Let it out.  It is cruel to keep a wild animal locked up.  Uncap it.  Release it . . . stand back!!  Wallow in its golden glow in a glass beneath a white foaming head. Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled—and in heat—is pure GONZO!!  It has taken 20 years to get from there to here.  Enjoy! – Ralph Steadman

(R. 1 at Page ID 5, ¶ 16.)

Before Flying Dog could sell "Raging Bitch" beer in Michigan, the company was required to seek a registration number and approval from the Michigan Liquor Control Commission. Mich. Admin. Code R. 436.1611.  The issue before the Commission was approval of the beer label—its written inscription and the pictorial representation that provided context and meaning for the label's language.  The Commission derives its authority from the Michigan Constitution, which provides that the "legislature may by law establish a liquor control commission which,

subject to statutory limitations, shall exercise complete control of the alcoholic beverage traffic within this state, including the retail sales thereof." Mich. Const. art. 4, § 40 (1963). Pursuant to this constitutional authority, the Michigan Legislature created a five-member administrative body appointed by the governor with the advice and consent of the senate to regulate alcohol sales in Michigan. Mich. Comp. Laws § 436.1209. No more than three of the five members of the Commission may be members of the same political party. *Id.* Two members, one from each political party, serve as Hearing Commissioners to handle "violation cases." *Id.* The other three members serve as Administrative Commissioners who are responsible for administering the laws applicable "to licensing, purchasing, enforcement, merchandising, and distribution." *Id.* At least two of the Administrative Commissioners sit as an appeal board to review initial decisions. *Id.*

At the time of relevant events, the Administrative Commissioners were Nida Samona, Donald Weatherspoon, and Patrick Gagliardi. Samona served as the Commission Chairperson. The Hearing Commissioners were Colleen Pobur and Edward Gaffney. Although Flying Dog initially named all five as defendants in this suit, only the Administrative Commissioners remain in the litigation. (R. 1 at Page ID 2-3, ¶¶ 6-7.)

In September 2009, Flying Dog requested approval to register "Raging Bitch" for distribution and sale in Michigan. Chairperson Samona and Commissioner Weatherspoon reviewed Flying Dog's request and denied it in a written order dated November 18, 2009, finding that the label violated Michigan Administrative Code Rule 436.1611(1)(d), a regulation which is no longer in effect. (R. 11-2 Page ID 28.) That rule authorized rejection of any beer label submitted for registration that was "deemed to promote violence, racism, sexism, intemperance or

intoxication or to be detrimental to the health, safety or welfare of the general public." (R. 11-4 Page ID 50.) The Commissioners denied Flying Dog's application because "the proposed label which includes the brand name 'Raging Bitch' contains such language deemed detrimental to the health, safety, or welfare of the general public." (R. 11-2 Page ID 28.) Flying Dog appealed.

Commissioners Gagliardi and Weatherspoon held an appeal hearing in April 2010. Flying Dog's CEO, James Caruso, and his attorney appeared. Caruso stated that the company chose the "edgy" name and label because it reflected the nature of the Belgian yeast used to make the beer, and it promoted the Flying Dog brand. (R. 11-3 Page ID 33–34, 37.) Caruso also represented that his employees—"many ladies working with Flying Dog"—and female customers in bars where Flying Dog conducted market research loved the label and thought it was humorous. Caruso reported that the beer was selling well in other states, and "I apologize if anything about it was offensive to the State of Michigan. I understand the role we play and how necessary it is to certainly be the traffic control as to what comes into the state, especially as beer." *Id.* at 37.

The Commission's attorney reminded the Commissioners that they had previously declined to approve labels using the words "Bitch, Bubbly Bitch, Royal Bitch and Mad Bitch," and drew the Commissioners' attention to the back of the beer label containing the sentence, "Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled—and in heat—is pure GONZO!!" The attorney reported visiting Flying Dog's website where he found the remark, "Raging Bitch, if you're lucky, your bitch will look this sexy after 20 years." (R. 11-3 at Page ID 38–39.) Noting that not "many dogs . . . live[] twenty years," the attorney observed "[t]here is a tenor, if you will, to the promotion that I think you have quite correctly caught and need to address." *Id.* at Page ID 39.

4

Commissioner Weatherspoon observed that a "dog's not going to drink this beer. . . . it says and in heat, which specifically refers to a female dog . . . [s]o you got to get me from the dog in terms of the reference here, to humans." *Id.* at 39, 41. Caruso explained that "it's a play on words . . . . So Raging Bitch is a, well you can call it a brood bitch for Raging Bitch when a dog is in heat," to which Commissioner Weatherspoon replied, "That's not the words you used." *Id.* at 41. Caruso argued that the Commission had previously approved Flying Dog's beer label for "In-Heat Wheat" and at one time had approved the name "Blond Bitch" submitted by Horny Bitch Beer Company. *Id.* at 42–43. It was Flying Dog that proposed the review standard of the Commission with Caruso's statements and conclusion that "there's a difference between edgy and offensive, and it's certainly a gray area and you gentlemen will determine where that edge is." *Id.* at 44. Commissioner Gagliardi replied, "That's what we're here to do, Mr. Caruso, . . . when we're in a gray area, [we] attempt to err on the side of the least offensive. . . . [W]e have not been willing to put this particular five-letter word on the front of the box." Observing that the Commission had previously "licensed Flying Dog in the State of Michigan" and recognizing that "there's a place for [Gonzo journalism]," Commissioner Gagliardi stated, "we don't believe in censorship . . . but we also are placing a product in front of ten million people in the State of Michigan. That product goes in front of all ages from children on up, they go to the supermarkets, they go to the party stores with their parents and yes, although beers are in a certain area, they still walk by them." He concluded that, "we do have a responsibility here to place product in a public place with the names that are on it, and that's what we take very seriously." *Id.* at 44–45.

On July 7, 2010, the Commissioners denied Flying Dog's appeal and affirmed the Commission's November 2009 order, referring to that earlier order as finding that the proposed

label "includes language deemed detrimental to the health, safety, or welfare of the general public due to the promiscuous nature of the product label." R. 11-4 Page ID 50. The Commissioners denied registration on appeal because the beer label "contains such language deemed detrimental to the health, safety, or welfare of the general public." (R. 11-4 Page ID 51.)

Flying Dog subsequently filed this § 1983 suit against the Commissioners in their individual capacities, alleging that rejection of its beer label violated its First Amendment rights. (R. 1 at Page ID 9, ¶ 32.) Flying Dog claimed that Rule 436.1611(1)(d) was constitutionally invalid, both facially and as applied. (R. 1 at Page ID 9, ¶¶ 31-35.) The brewery sought declaratory and injunctive relief, and demanded a jury trial on the issue of compensatory damages. (R. 1 at Page ID 9-10, Prayer for Relief ¶¶ 1-4.)

Flying Dog moved for a preliminary injunction to bar enforcement of Rule 436.1611(1)(d), but before the district court could rule on that motion, the Supreme Court decided *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011). The Commission then rescinded Rule 436.1611(1)(d) because *Sorrell* required "a heightened degree of scrutiny" of "commercial speech regulated by the government" and because of Michigan's "recent emphasis . . . on regulatory reform." (R. 39-1 at Page ID 280.) The Commission approved Flying Dog's "Raging Bitch" label, prompting the district court to dismiss the motion for a preliminary injunction as moot. (R. 43 at Page ID 290; R. 39-2 at Page ID 283.) Only Flying Dog's request for compensatory damages remained for resolution.

The Commissioners moved to dismiss, for judgment on the pleadings, and for summary judgment, arguing that they are protected by quasi-judicial and qualified immunity. (*See* R. 53 Page ID 323; R. 54 Page ID 333.) Flying Dog moved for partial summary judgment on the issue

6

of liability. (R. 56.) The district court treated the Commissioners' motion as one for summary judgment and granted it, and denied Flying Dog's motion for partial summary judgment. Observing that this circuit had not decided whether members of a state administrative body with the authority to make licensing decisions are entitled to quasi-judicial immunity, the district court extended quasi-judicial immunity to the Commissioners. *Flying Dog Brewery*, 870 F. Supp. 2d at 482–84. Alternatively, the court ruled that the beer label was commercial speech subject to the analytical framework set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–65 (1980), rejected Flying Dog's invitation to apply the prior restraint doctrine, and held that the Commissioners were entitled to qualified immunity because the specific First Amendment right at issue was not clearly established at the time the Commissioners rendered their decisions. *Id.* at 484–88. The court declined to reach the constitutional question of whether the Commissioners violated Flying Dog's First Amendment rights. *Id.* at 488–89. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's decision to grant summary judgment. *See Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011). Summary judgment is proper if there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

7

prevail as a matter of law." *Id.* at 251–52. We begin our analysis with the Commissioners' defense of quasi-judicial immunity.

## B. Quasi-judicial immunity

The Supreme Court has long observed that a judge "may not be held accountable in damages for a judicial act taken within his [or her] court's jurisdiction. [Absolute] immunity applies however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Cleavinger v. Saxner*, 474 U.S. 193, 199–200 (1985) (internal quotation marks omitted). The Court's case law "suggest[s] an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Forrester v. White*, 484 U.S. 219, 227 (1988). The Court has extended absolute immunity to some officials who are not judges, but who "perform functions closely associated with the judicial process." *Cleavinger*, 474 U.S. at 200–01. The level of immunity granted to various public officials is adjusted because it is "the nature of the function performed, not the identity of the actor who performed it, that inform[s the] immunity analysis." *Id.* at 229. Quasi-judicial immunity "attaches to public officials whose roles are functionally comparable to that of a judge." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (internal quotation marks omitted).

To determine whether a public official is entitled to quasi-judicial immunity, we examine "the nature of the functions with which a particular official or class of officials has been lawfully entrusted," and "evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 484 U.S. at 224. We consider a

non-exhaustive list of factors "characteristic of the judicial process" to determine whether a public official should be afforded quasi-judicial immunity:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202 (citation omitted). The Supreme Court has "been quite sparing in [its] recognition of absolute immunity," and has declined "to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991) (internal quotation marks and citation omitted). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486–87. Consequently, officials who seek "absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou*, 438 U.S. 478, 506 (1978).

We lack the benefit of a Supreme Court or Sixth Circuit opinion on whether members of a state administrative body who initially grant or deny beer label registration are entitled to absolute immunity. Our most analogous case is *Watts v. Burkhart*, 978 F.2d 269, 271 (6th Cir. 1992) (*en banc*), where we held that members of the Tennessee Board of Medical Examiners should be afforded the protection of quasi-judicial immunity for acts taken in suspending a medical license. Important factors supporting our decision were that the members of the Board, although appointed by the governor, did not serve at his or her pleasure, *id.* at 275, and the Tennessee Administrative Procedures Act provided adequate procedural safeguards for contested cases, *id.* at 276. We observed that "the act of revoking a physician's license . . . is likely to stimulate a litigious reaction

from the disappointed physician, making the need for absolute immunity apparent." *Id.* at 278 (internal quotation marks omitted). The Seventh Circuit reached similar holdings in cases challenging the actions of liquor commissioners in revoking or suspending licenses. In *Killinger v. Johnson*, 389 F.3d 765, 770 (7th Cir. 2004), the court held that a local liquor commissioner's decision to suspend a license, impose a fine, and summarily close a licensee's business is protected by quasi-judicial immunity, and in *Reed v. Village of Shorewood*, 704 F.2d 943, 951 (7th Cir. 1983), the court held that a local liquor commissioner was entitled to absolute immunity when considering the revocation of a liquor license.

In *Keystone Redevelopment Partners*, 631 F.3d at 91, the Third Circuit applied the *Cleavinger* factors to hold that members of the Pennsylvania Gaming Control Board were entitled to quasi-judicial immunity for their decisions to grant gaming licenses. That court determined that the first *Cleavinger* factor—the need to assure that the function could be performed without harassment or intimidation—weighed in favor of granting the commissioners absolute immunity due to the large financial stakes and the "strong incentive to counter-attack" an adverse decision. *Id.* at 96–97 (internal quotation marks omitted). Because parties seeking licensing possessed substantial financial resources and could engage in extensive litigation, licensing decisions might be impacted if the board members knew they could be sued for monetary damages. *Id.* at 97. Moreover, the presence of institutional safeguards weighed in favor of immunity because the Gaming Board was required to give notice to the parties and the public, hold public-input hearings, and abide by specific procedures for conducting hearings. *Id.* at 98. In addition, the applicants were entitled to counsel, and the Board could subpoena witnesses and documents and accept only

sworn testimony. *Id.* Finally, the Board had to issue a written decision and transcribe the record. *Id.* at 98 (citations omitted).

The Third Circuit found that the third factor—insulation from political influence—was satisfied because board members served fixed terms and could be removed from office only for limited reasons, including misconduct and criminal conviction. They were prohibited from political involvement, and they were required to recuse themselves if their impartiality was called into question. *Id.* The fourth factor—reliance on precedent—was satisfied because the board was required to rely on specific statutory criteria in making decisions, employ a "clear and convincing" standard, and issue a written decision accompanying its order. *Id.* at 98–99.

The court found the licensing process to be sufficiently adversarial as well. Applicants were given reasonable notice and an opportunity to be heard, they were entitled to make objections to the Board's rulings during the hearing, and they could present evidence, briefs, and engage in oral argument. *Id.* at 99. Finally, unsuccessful licensees had a right of appeal to the Pennsylvania Supreme Court. *Id.* at 100–01.

We find the Third Circuit's analysis of the non-exhaustive *Cleavinger* factors useful. We apply a similar approach to decide only whether the Administrative Commissioners who grant or deny beer label registration applications are entitled to quasi-judicial immunity. We expressly do not consider whether quasi-judicial immunity is warranted for other factual situations the Administrative Commissioners may face, nor do we consider whether the Hearing Commissioners who suspend or revoke liquor licenses in disciplinary cases are entitled to quasi-judicial immunity. Those questions are not before us.

*1.    Performance of functions without harassment or intimidation*

Flying Dog does not dispute "that every official should be able to perform legitimate functions 'without harassment or intimidation,'" Appellant's Br. at 62, but argues that the Administrative Commissioners are not entitled to quasi-judicial immunity because their licensing actions are ministerial in nature and there is "zero 'empirical evidence demonstrating the existence of any significant volume of vexatious and burdensome actions against' them." *Id.* at 63.   The Commissioners warn that they "simply could not function" if they are subject to individual liability for the many licensing decisions made each year, and no empirical evidence is necessary to prove it.

We do not agree that the Administrative Commissioners' denial of Flying Dog's application can be characterized as ministerial.   The Commissioners exercised significant discretion when they rejected Flying Dog's proposed beer label.   Moreover, a lack of empirical evidence is not dispositive.   In *Buckles v. King County*, 191 F.3d 1127, 1136 (9th Cir. 1999), the Ninth Circuit predicted that a number of losing parties would sue zoning board members for damages if they were not protected by absolute immunity, and just as there were significant economic gaming interests at stake in *Keystone Redevelopment Partners*, 631 F.3d at 96–97, there are significant economic interests at stake in the development of a beer product and its label. Because the Administrative Commissioners' ability to operate would undoubtedly be hindered if they were routinely sued for damages for denying beer registration applications, this factor favors the Commissioners.

No. 12-1984, *Flying Dog Brewery v. Mich. Liquor Control, et al.*

### 2.      *Safeguards reducing the need for private damages actions*

The second *Cleavinger* factor addresses whether a regulatory body's operations are governed by procedural safeguards that will serve to control unconstitutional conduct, "such as the right to counsel, adequate notice of a hearing, and the opportunity to present and cross-examine witnesses." *O'Neal v. Miss. Bd. of Nursing*, 113 F.3d 62, 66 (5th Cir. 1997).

The Commission's rules appear to provide more extensive procedural safeguards to parties who appear before the Hearing Commissioners due to liquor violations than to parties who appear before the Administrative Commissioners on initial licensing matters.   *See* Mich. Admin. Code R. 436.1905 to 436.1923.   In the case of a liquor violation, a complaint identifying the alleged violation must be served on the licensee "not less than 20 days before the scheduled hearing date." Mich. Admin. Code R. 436.1905(4).   The licensee must be advised in the notice that she has a right to be represented by an attorney.   Mich. Admin. Code R. 436.1905(6).   If the licensee is not represented by counsel, she must be advised by the hearing commissioner of the right to present evidence and the right to cross-examine commission witnesses.   Mich. Admin. Code R. 436.1909(2).   The hearing commissioner's findings of fact, conclusions of law, and an order must be mailed to the licensee and her attorney, if any, within 45 days after the hearing unless the Commission enters a written order extending the period.   Mich. Admin. Code R. 436.1909(1). Violation appeal hearings are conducted by the three Administrative Commissioners, and specified procedures govern violation appeal proceedings.   Mich. Admin. Code R. 436.1917(2), 436.1921 & 436.1923.   Procedural safeguards like these reduce the need for private damages actions.   *See O'Neal*, 113 F.3d at 66.

13

No. 12-1984, *Flying Dog Brewery v. Mich. Liquor Control, et al.*

By contrast, the Commission's regulation addressing hearings for matters other than liquor violations provides:

> Rule 25.   (1) The commission, on its own motion, may order a hearing on a matter within its jurisdiction.
>
> (2) Applications for a license issued under the act or commission rules shall be reviewed by the administrative commissioners.   If a license application is denied, then the aggrieved license applicant may request an appeal hearing, and the commission shall grant the hearing.   The request shall be made to the Lansing office of the Commission within 20 days from the date of the mailing of the decision of denial.
>
> (3) The chairperson may designate 1 or more commissioners to hear matters other than a violation of the act or commission rules.
>
> (4) In a hearing on matters other than a violation of the act or commission rules, the commission may determine which party has the burden of proceeding.

Mich. Admin. Code. R. 436.1925.   The licensee may be represented by a licensed attorney, *see* Mich. Admin. Code. R. 436.1933, and the Commission, on written application, shall subpoena witnesses to a hearing or appeal hearing.   *See* Mich. Admin. Code. R. 436.1929.   The subpoena right certainly implies that the licensee may present evidence and cross-examine witnesses, but we have not located a regulation requiring the Commissioners to issue written findings of fact and conclusions of law to explain their reasons for granting or denying an initial registration application.   Further, this case demonstrates that any appeal from an initial denial of a license may be heard by one or more of the same Administrative Commissioners who participated in the initial decision.   An aggrieved party may, however, seek judicial review in an appropriate state circuit court "from any order, decision, or opinion of any state board, commission, or agency."   Mich. Comp. Laws § 600.631.

14

The existence of some procedural safeguards helps to reduce the need for private damages actions. But because the regulations do not require the Administrative Commissioners to explain their decisions through findings of fact and conclusions of law, unconstitutional decision-making may remain largely unchecked even where judicial review is available. Revisions to the Commission's regulations might correct this deficiency, but under the regulations in force at the time of these events, this *Cleavinger* factor weighs in favor of denying quasi-judicial immunity to the Administrative Commissioners.

### 3. *Insulation from political influence*

The Commissioners have some of the characteristics courts have deemed important in determining whether a state official is insulated from the political process. No more than three of the five commissioners may be chosen from the same political party, and the commissioners are "appointed by the governor with the advice and consent of the senate." Mich. Comp. Laws Ann. § 436.1209(2). The members "devote [their] entire time to the performance of the[ir] duties" as commissioners, *id.* § 436.1209(4), and hold four-year terms. *Id.* § 436.1209(5). They can be removed from their appointed positions only for "malfeasance, misfeasance, or neglect in office." *Id.* Other cases have concluded that similar provisions sufficiently insulated officials from political influence. *See, e.g.*, *Watts*, 978 F.2d at 275; *Keystone*, 631 F.3d at 98. This factor weighs in favor of quasi-judicial immunity.

### 4. *Importance of precedent*

We next consider the importance of precedent in the Commissioners' decision-making process, an issue that dovetails with our previous discussion of the second *Cleavinger* factor. In *Keystone*, the Third Circuit observed that the gaming board was required to base its decision on

15

specific statutory criteria, satisfy a clear and convincing standard, and issue a written opinion with its order. 631 F.3d at 99. By comparison, the Administrative Commissioners' licensing decisions need not follow any specific statutory criteria or satisfy a clear and convincing standard, and the Commissioners' written orders do not qualify as written legal opinions. Although the record suggests that the Administrative Commissioners strive to issue consistent decisions, they do not appear to be bound by any precedent typical of a legal inquiry. Hence, this factor, like the second, weighs in favor of denying quasi-judicial immunity.

> 5. *Adversarial nature of the process*

The resolution of the fifth *Cleavinger* factor follows from the disposition of the second and fourth factors. The initial licensing application process, as it is currently constructed, is not sufficiently adversarial to warrant a grant of quasi-judicial immunity to the Administrative Commissioners. This factor suggests a denial of quasi-judicial immunity.

> 6. *Availability of appellate review*

Finally, we arrive at the question of appellate review. Under the pertinent Michigan regulation, a party whose registration application is denied may request an administrative appeal, and the Commission must grant an appeal hearing. Mich. Admin. Code R. § 436.1925. We previously noted that the appeal hearing panel is comprised of Administrative Commissioners who ruled on the initial registration request and not independent reviewers. Judicial review of the administrative appellate decision is, however, available. Mich. Comp. Law § 600.631. The existence of judicial review tilts this factor toward granting quasi-judicial immunity because any errors of the Administrative Commissioners may be "largely remediable through the appellate process." *Heyde v. Pittenger*, 633 F.3d 512, 519 (7th Cir. 2011) (quoting *Reed v. Village of*

*Shorewood*, 704 F.2d 943,952 (7th Cir. 1983)). Flying Dog chose not to seek judicial review in state court of the Administrative Commissioners' decisions.

Because the six *Cleavinger* factors are divided evenly both for and against a grant of quasi-judicial immunity, we call this close question in favor of Flying Dog. We limit our decision on quasi-judicial immunity to the specific factual and legal circumstances presented by this case. Accordingly, we reverse the district court's conclusion that quasi-judicial immunity is warranted here, and we turn to the question of qualified immunity.

## C.     Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The defense covers mistakes in judgment, whether of fact or law, *Pearson*, 555 U.S. at 231, and it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The qualified immunity doctrine precludes federal courts from awarding damages against a government official in his or her individual capacity unless that official violated a statutory or constitutional right and the right was clearly established at the time the conduct occurred. *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Administrative Commissioners bear the initial burden to provide facts suggesting that they acted within the scope of their discretionary authority when they ruled on Flying Dog's application. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). If they do so, the burden shifts to Flying Dog to demonstrate that the Commissioners' "conduct violated a right so

17

clearly established that any official[s] in [their] position would have clearly understood that [they were] under an affirmative duty to refrain from such conduct. *Id.* In assessing the qualified immunity defense, we have "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080 (2011). We begin with the district court's analysis on the second part of the qualified immunity inquiry: whether the constitutional right the Administrative Commissioners are alleged to have violated was clearly established at the time the Commissioners acted.

A government official is liable for the violation of a constitutional right if "the right was clearly established . . . in light of the specific context of the case." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (internal quotations marks omitted). A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013). We undertake the qualified immunity inquiry "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal quotation marks omitted). In doing so, we consider first the decisions of the Supreme Court, then our own decisions and those of other courts within the circuit, and then the decisions of other circuits. *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083. "'In an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law.'" *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199).

The Supreme Court held nearly thirty-five years ago that government officials may regulate truthful, non-misleading commercial speech only if the regulation directly advances a substantial state interest and the regulation is not more extensive than necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 565 (1980). In *Central Hudson*, the Court overturned the Public Service Commission's complete ban on promotional advertising by an electric utility. Taking up the issue of "expression related solely to the economic interests of the speaker and its audience," *id.* at 561, the Court reiterated "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Id.* at 562 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978)). "The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," and the "protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Id.* at 562–63. Because First Amendment protection is extended to commercial speech to guard the informational function of advertising, the government may ban commercial speech that relates to illegal activity or that misleads the public about lawful activity. *Id.* at 563–64.

The Supreme Court recognized that [i]n most other contexts, the First Amendment prohibits regulation based on the content of the message," but the government can regulate commercial speech based on content because "commercial speakers have extensive knowledge of both the market and their products" and are thereby "well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity." *Id.* at 564 n.6. In addition, "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is

19

not particularly susceptible to being crushed by overbroad regulation." *Id.* (internal quotation marks omitted).

Honoring the distinctions between commercial speech and other forms of constitutionally protected expression, the Court outlined a four-part test for courts to use in evaluating whether government regulation of commercial speech violates the First Amendment:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

In the year after the Supreme Court issued *Central Hudson*, we held that a municipality's decision to revoke a restaurant's permit to display the name "Sambo's" violated the First Amendment. *Sambo's Rest., Inc. v. City of Ann Arbor*, 663 F.2d 686, 695 (6th Cir. 1981). Having reviewed a trial on the merits, we emphasized that "the City has produced no evidence to demonstrate that the actual operation of the restaurant under the name 'Sambo's' has retarded or impeded achievement or furtherance of its goal o[f] racial equality. . . . The impact on these laudable goals by 'Sambo's' is speculative at best." *Id.* We explained that "[m]uch more than a speculative causal relationship is required" before a city may "shut off discourse" to protect those offended by the speech from hearing it. *Id.*

Years after we decided the *Sambo's* case, the Supreme Court applied the *Central Hudson* test to hold that a total government ban on placing alcohol content on beer labels violated the First

20

Amendment. *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). *Rubin* resolved any doubt that First Amendment commercial speech principles apply to the content of beer labels.

The following year, the Supreme Court ruled that Rhode Island's statutory ban on advertisements displaying accurate information about retail prices of alcoholic beverages could not stand under the First Amendment. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996). The Court characterized the advertising ban as "an abridgement of speech protected by the First Amendment" and ruled that the decision to ban was "not shielded from constitutional scrutiny by the Twenty-first Amendment." *Id.* "[A]lthough the Twenty-first Amendment limits the effect of the dormant Commerce Clause on a State's regulatory power over the delivery or use of intoxicating beverages within its borders, the Amendment does not license the States to ignore their obligations under other provisions of the Constitution." *Id.* at 516 (internal quotation marks omitted). Thus, the Twenty-first Amendment does not "diminish the force" of the Supremacy Clause, the Equal Protection Clause, or the Free Speech and Establishment Clauses of the First Amendment. *Id.* In the end, the Twenty-first Amendment could not save Rhode Island's ban on the advertising of liquor prices. *Id.*

In the face of this strong line of First Amendment precedent, the Administrative Commissioners point to the Second Circuit's grant of qualified immunity to state liquor commissioners who banned a vulgar beer label. *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87 (2d Cir. 1998). The Commissioners contend that *Bad Frog Brewery* demonstrates that the law in this area was not clearly established at the time the Commissioners acted. We disagree.

In *Bad Frog Brewery*, the district court held that the rejection of Bad Frog's beer label, which showed a frog "giving the finger," did not violate the First Amendment. *Id.* at 102. The Second Circuit reversed on the constitutional question, but nonetheless concluded in one sentence that "[t]he District Court's decision upholding the denial of the application, though erroneous in our view, sufficiently demonstrates that it was reasonable for the commissioners to believe that they were entitled to reject the application." *Id.* The court offered no further elaboration on its qualified immunity analysis so there is little we can take from that grant of qualified immunity to guide our decision here. *Bad Frog Brewery* is persuasive authority only for the point that state liquor commissioners should have been on notice after 1998 that banning a beer label for vulgarity violates the First Amendment.

By the time the Administrative Commissioners banned Flying Dog's beer label in 2009, the clear line of Supreme Court commercial speech precedents, coupled with our own decision in *Sambo's* and the persuasive opinion of the Second Circuit in *Bad Frog Brewery*, should have placed any reasonable state liquor commissioner on notice that banning a beer label based on its content would violate the First Amendment unless the *Central Hudson* test was satisfied. Consequently, we disagree with the district court's determination that applicable First Amendment law was not clearly established in 2009 and set aside the grant of qualified immunity to the Commissioners.

## D. Remand is warranted

Having resolved the case on immunity grounds, the district court did not reach the issue decided by the dissent—whether the Administrative Commissioners violated Flying Dog's clearly

established First Amendment rights. The district court should undertake this inquiry in the first instance.

We do not agree with the dissent that the factual record was sufficiently developed and undisputed on summary judgment to entitle Flying Dog to judgment as a matter of law. The dissent recognizes that the Commissioners' affidavits submitted in connection with the summary judgment motions create issues of fact, particularly with respect to the Commissioners' asserted reasons for denying the beer label registration and the evidentiary support for those reasons. We disagree with the dissent's application of the *Central Hudson* factors at this stage due to the lack of critical evidence and fact-finding by the district court. The record in this civil rights lawsuit is not confined to the few facts developed in the administrative proceedings, nor are we free to find the facts on appeal. As in any other case, the litigants are entitled to the full process that enables the district court to resolve all disputes of fact impacting the *Central Hudson* analysis.

Supreme Court cases provide guidance for the task of assessing the propriety of governmental restrictions on commercial speech by, for example, illustrating methods for answering the *Central Hudson* inquiry—is there a sufficient "fit" between the regulatory goal and the means chosen to accomplish it. Comparable cases establish that the Commissioners here may be able to justify their restriction on Flying Dog's speech through various kinds of proof, including reference to empirical data, studies, and anecdotes, and perhaps even through "history, consensus, and simple common sense." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks omitted); *Gibson v. Texas Dep't of Ins.*, 700 F.3d 227, 237 (5th Cir. 2012). In both *44 Liquormart, Inc.* and *Rubin*, the Supreme Court had before it factual records developed in the district courts accompanied by findings of fact and conclusions of law. In *44 Liquormart,*

23

*Inc.*, the district court made its findings and conclusions after considering videotaped depositions and other evidence presented at a hearing, including "conflicting expert testimony" on whether a regulation was more extensive than necessary to serve a substantial governmental interest. 517 U.S. at 493–94. Similarly, the *Rubin* case arrived at the Supreme Court on a developed factual record after two appeals in the Tenth Circuit, beginning with *Adolph Coors Co. v. Brady*, 944 F.2d 1543 (10th Cir. 1991). *Rubin*, 514 U.S. at 479. In *Brady*, the Tenth Circuit applied *Central Hudson* to determine that the government's asserted interest in banning alcohol content on beer labels was "substantial," but because "the record provided insufficient evidence to determine" whether the ban on disclosure directly advanced the government's interest, the court remanded the case for further proceedings to ascertain whether the "fit" requirement was met. *Id.* After "further factfinding," the district court upheld a ban for advertising, but invalidated a ban for beer labels. *Id.* On the subsequent appeal concerning only the labeling ban, the Tenth Circuit affirmed, *Adolph Coors Co. v. Bentsen*, 2 F.3d 355 (10th Cir. 1993), and the Supreme Court granted certiorari and affirmed. *Id.* at 479–80. Likewise, in *Sambo's Restaurants*, we decided the appeal after a trial on the merits in the district court on stipulated facts. *Sambo's Restaurants, Inc.*, 663 F.2d at 687.

We are not certain whether, in this case, the parties had completed discovery by the time they filed the motions for summary judgment or whether additional factual development of the record is warranted. And of course we do not have the benefit of the district court's opinion examining the Commissioners' proof on the "fit" requirement to determine whether there are genuine issues of material fact remaining for trial. If there are, then the district court must conduct a bench trial followed by findings of fact and conclusions of law.

In light of the governing Supreme Court authority and our decision to set aside the district court's immunity rulings, we remand the case to the district court for further proceedings on the issue of whether the Administrative Commissioners violated Flying Dog Brewery's clearly established First Amendment rights.

### III. CONCLUSION

Accordingly, we REVERSE the district court's decision to grant the Commissioners quasi-judicial and qualified immunity and we REMAND the case to the district court for further proceedings consistent with this opinion.

**KAREN NELSON MOORE, Circuit Judge, dissenting in part and concurring in the judgment in part.** For the reasons that I express below, I agree with the majority's judgment that defendants are not entitled to quasi-judicial absolute immunity. However, I dissent from the majority's decision to remand to the district court to determine whether the Commissioners violated Flying Dog's First Amendment rights. There is no reason to remand to determine whether a constitutional violation occurred when the law is clear, both sides have moved for summary judgment, and there are no genuine issues of material fact relating to liability. Because I would hold that the Commissioners violated Flying Dog's clearly established First Amendment rights by denying Flying Dog's registration request based on the content of the beer bottle label, I must dissent. I would remand only for a determination of the amount of damages.

## I. BACKGROUND

Flying Dog Brewery, LLLP ("Flying Dog") is a craft beer manufacturer based in Frederick, Maryland. According to George Stranahan, the Flying Dog co-founder, the company's image is inspired by journalist and author Hunter S. Thompson, and the brewery's marketing "promotes the irreverent 'gonzo' spirit and outlook for which Thompson is noted." R. 1 (Compl. at ¶ 11) (Page ID #3). Flying Dog commissions illustrations for beer bottle labels, packaging, and related merchandise from artist Ralph Steadman, who provided illustrations for Thompson's book *Fear and Loathing in Las Vegas*. Steadman provided the illustration and a quote for the "Raging Bitch" label:

> "Two inflammatory words . . . one wild drink. Nectar imprisoned in a bottle. Let it out! It is cruel to keep a wild animal locked up. Uncap it. Release it . . . stand back!! Wallow in its golden glow in a glass beneath a white foaming head. Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled—and in

heat—is pure GONZO!! It has taken 20 years to get from there to here. Enjoy!"—Ralph Steadman.

*Id.* at ¶ 16 (Page ID #5); *see* Appendix A.

Beer may not be sold in the State of Michigan unless "[t]he beer has received a registration number from the [Michigan Liquor Control Commission ("Commission")] and has been approved for sale by the commission." Mich. Admin. Code R. 436.1611(1)(c). At the time of the relevant events, the Commission contained five members: Colleeen Pobur and Edward Gaffney were Hearing Commissioners who adjudicated violations of Michigan liquor laws and regulations, and Nida Samona, Donald Weatherspoon, and Patrick Gagliardi were Administrative Commissioners who reviewed issues related to "licensing, purchasing, enforcement, merchandising, and distribution." Mich. Comp. Laws. § 436.1209(2); R. 1 (Compl. at ¶ 18) (Page ID #5). Samona was the Chairperson of the Commission. In September 2009, Flying Dog submitted "Raging Bitch" for approval by the Administrative Commissioners. Chairperson Samona and Commissioner Weatherspoon participated in the initial review of Flying Dog's request. Flying Dog's request was denied in a written order dated November 18, 2009, citing then-applicable Michigan Administrative Code Rule 436.1611(1)(d) (2004), which provided that "[t]he commission may disapprove any beer label submitted for registration that is deemed to promote violence, racism, sexism, intemperance, or intoxication or to be detrimental to the health, safety, or welfare of the general public." The order stated that "[t]he Commission finds that the proposed label which includes the brand name 'Raging Bitch' contains such language deemed detrimental to the health, safety, or welfare of the general public." R. 11-2 (Nov. 18, 2009 Order at 1) (Page ID #28).

Flying Dog requested an administrative appeal hearing. A hearing was held in front of Commissioners Gagliardi and Weatherspoon on April 22, 2010. At the hearing, Flying Dog CEO James Caruso explained that the brewery conducted market research in bars and stated that women loved the "Raging Bitch" name and thought it was humorous and consistent with the Flying Dog brand and noted that "Raging Bitch" was approved for sale in many other states. Caruso pointed out that the Commission previously approved provocative labels from Flying Dog, including a label for a beer named "In-Heat Wheat" that depicted a caricature of a dog with a blood splatter. In response to a question from Commissioner Weatherspoon regarding previous denials of products with the word "bitch" in the name, Caruso stated that "Blond Bitch was approved here at one time, and I think that was a clearly a female on the label by Horny Bitch Beer Company." R. 11-3 (Appeal Tr. at 15) (Page ID #43). Caruso emphasized that "there's a difference between edgy and offensive, and it's certainly a gray area and you gentlemen will determine where that edge is." *Id.* at 16 (Page ID #44). Commissioner Gagliardi responded, "[t]hat's what we're here to do Mr. Caruso, is to attempt to—when we're in a gray area, attempt to err on the side of the least offensive." *Id.* Gagliardi stated "[W]e don't believe in censorship, that's not what we're doing here, but we also are placing a product in front of ten million people in the State of Michigan. . . . It's very important in our position, the signals that we send. . . . I don't think Commissioner Weatherspoon or the Chairwoman are averse[] to having or reading edgy writing; but we do have a responsibility here to place product in a public place with the names that are on it, and that's what we take very seriously." *Id.* at 16–17 (Page ID #44–45).

Flying Dog's appeal was denied in a written order dated July 7, 2010, and signed by Commissioners Gagliardi and Weatherspoon. The appeal denial order stated that the

Commission "continues to find that the label in question contains such language deemed detrimental to the health, safety, or welfare of the general public and the basis of denial as set forth in its order of November 18, 2009 is justified." R. 11-4 (July 7, 2010 Order at 1–2) (Page ID #50–51). Therefore, the Commission affirmed the denial of Flying Dog's "request to register 'Raging Bitch' Belgian-style India Pale Ale for sale in the State of Michigan." *Id.* at 2 (Page ID #51).

On March 25, 2011, Flying Dog filed the instant § 1983 lawsuit in the U.S. District Court for the Western District of Michigan against the Commission; Chairperson Nida Samona; and Commissioners Donald Weatherspoon, Patrick Gagliardi, Colleen Pobur, and Edward Gaffney. The Chairperson and Commissioners were all sued in both their official and individual capacities. Flying Dog alleged that the "Raging Bitch" label constituted speech protected by the First Amendment; that Rule 436.1611(1)(d) was facially invalid as an unconstitutional prior restraint on protected speech; that the Rule was vague, ambiguous, and invalid as applied to bar the sale and advertisement of "Raging Bitch"; and that the "interruption and prevention of Flying Dog's advertisement and sale" violated Flying Dog's First Amendment rights. R. 1 (Compl. at ¶ 32–36) (Page ID #9). Flying Dog sought injunctive and declaratory relief; compensatory damages against defendants Samona, Weatherspoon, Gagliardi, Pobur, and Gaffney; and attorney fees.

On June 28, 2011, the Commission rescinded the portion of Michigan Administrative Code Rule 436.1611 that the Commissioners relied on in disapproving the "Raging Bitch" label. R. 39-1 (Rescission Order at 1) (Page ID# 280) (rescinding Rules 436.1611(1)(d), 436.1719(2), and 436.1829(2)). That same day, the Commission vacated its July 7, 2010 order, reversed its November 18, 2009 order, and granted Flying Dog's request for approval of "Raging Bitch." R. 33-2 (Approval Order at 1) (Page ID #256). Accordingly, Flying Dog withdrew its request for a

preliminary injunction, and the district court dismissed the motion for a preliminary injunction as moot. R. 43 (Inj. Order at 1) (Page ID #290). Thus, the critical remaining disputed claim was the claim for monetary damages against the Commissioners in their individual capacities. The defendants moved to dismiss the case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and 12(c), or in the alternative for summary judgment, and asserted that the Commissioners were entitled to either quasi-judicial absolute immunity or qualified immunity from suit. Flying Dog moved for partial summary judgment on the issue of First Amendment liability, which would leave only the question of damages.

The district court treated the defendant's motion as a motion for summary judgment. The district court concluded that Hearing Commissioners Pobur and Gaffney were not involved in the application denial, and dismissed the individual-capacity claims against Pobur and Gaffney. *Flying Dog Brewery, LLLP ("Flying Dog") v. Michigan Liquor Control Comm'n*, 870 F. Supp. 2d 477, 481–82 (W.D. Mich. 2012). The district court concluded that the Administrative Commissioners were entitled to quasi-judicial absolute immunity, and in the alternative, were entitled to qualified immunity because the First Amendment right at issue was not clearly established. The district court denied Flying Dog's motion for partial summary judgment.

Flying Dog timely appealed the district court's judgment with respect to Samona, Weatherspoon, and Gagliardi. Flying Dog did not appeal the grant of summary judgment to Pobur and Gaffney.

30

## II. QUASI-JUDICIAL IMMUNITY[1]

"It is well established that judges are entitled to absolute judicial immunity from suits for money damages for all actions taken in the judge's judicial capacity, unless these actions are taken in the complete absence of any jurisdiction." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). Judicial immunity serves the purpose of preventing timidity by judges fearful of "the resulting avalanche of suits, most of them frivolous but vexatious" by disappointed parties, *Forrester v. White*, 484 U.S. 219, 226–27 (1988), and recognizes that "[i]n general, litigants can protect themselves from judicial errors through the appellate process or other judicial proceedings without resort to suits for personal liability," *Bright v. Gallia Cnty.*, 753 F.3d 639, 649 (6th Cir. 2014). It is not only judges who are entitled to absolute immunity. "Quasi-judicial [absolute] immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush*, 38 F.3d at 847; *see also Forrester*, 484 U.S. at 225–26 ("Executive Branch officials who perform quasi-judicial functions" may be entitled to absolute immunity); *Watts v. Burkhart*, 978 F.2d 269, 272 (6th Cir. 1992) (en banc) ("prosecutors in the performance of their official functions" receive quasi-judicial absolute immunity). We take a functional approach to determining whether an individual who is

---

[1]As a preliminary matter, I note that although Michigan law provides that "member[s] of the commission shall not be personally liable for any action at law for damages sustained by a person because of an action performed or done by the commission or a member of the commission in the performance of their respective duties in the administration and implementation of this act," *see* Mich. Comp. Laws § 436.1225, state statutory immunity has no bearing on whether a state official is immune from a suit for money damages under § 1983. *See Martinez v. Cal.*, 444 U.S. 277, 284 n.8 (1980) ("[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.").

not a judge is entitled to quasi-judicial absolute immunity. "The immunity of participants in the judicial process stems not from the 'location' of the judicial process in one branch of government or another . . . but from the 'characteristics' of the process." *Watts*, 978 F.2d at 273.

> To determine if an official is entitled to quasi-judicial absolute immunity, we consider:
>
> First, does [the official], like a judge, perform a traditional, adjudicatory function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does [the official], like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does [the official], like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect [the person whose issue is being adjudicated] constitutional rights?

*Id.* at 278 (internal quotation marks omitted).

First, I consider whether Chairperson Samona and Commissioners Weatherspoon and Gagliardi perform a traditional adjudicatory function of "'decid[ing] facts, appl[ying] law, and otherwise resolv[ing] disputes on the merits (free from direct political influence).'" *Id.* (citation omitted). The Administrative Commissioners are politically independent. They are appointed by the governor with advice and consent of the state senate, Mich. Comp. Laws § 436.1209(2), and are appointed to four-year terms, Mich. Comp. Laws § 436.1209(5). The Commissioners must "devote [their] entire time to the performance of the[ir] duties," Mich. Comp. Laws § 436.1209(4), and can be removed only for "malfeasance, misfeasance, or neglect in office," Mich. Comp. Laws § 436.1209(5). *Cf. Cleavinger v. Saxner*, 474 U.S. 193, 204 (1985) (members of a prison grievance committee were not independent from the Bureau of Prisons or the fellow employees whose conduct may be implicated in the discipline proceeding). However, the Administrative Commissioners do not perform a traditional adjudicatory function when they consider a beer registration request. The Administrative Commissioners' application of the labeling regulation

appears to be totally discretionary, with no consideration of caselaw, statutory interpretation, or the Constitution. *Cf. Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 783 (1st Cir. 1990) (holding that a state medical board member was "'functionally comparable' to that of a judge; he weighs evidence, makes factual and legal determinations, chooses sanctions, writes opinions explaining his decisions, serves a set term (three years), and can be removed only for cause."). During the appeal hearing, Commissioner Weatherspoon stated that the Commission routinely denied requests with the word "bitch," but never explained why this routine determination was valid under the regulation or the Constitution. The Commissioners do not appear to explain their opinions, apply facts to law, or consider legal precedent. Accordingly, the Administrative Commissioners do not act in a traditional adjudicatory role.

Next, I consider whether Chairperson Samona and Commissioners Weatherspoon and Gagliardi decide cases that are sufficiently controversial such that the Commissioners would be subject to numerous damages actions in the absence of absolute immunity. The record does not contain any evidence on the number of lawsuits for injunctive relief or damages, if any, that have been lodged against the appellants, and we have no way to predict, as an empirical matter, whether denying absolute immunity to the appellees would result in a flood of vexatious litigation. Other circuits have considered the monetary stakes to determine whether absolute immunity is necessary to allow the Commissioners to do their job without distraction and fear of lawsuits for damages. *See Keystone Redev. Partners, LLC v. Decker*, 631 F.3d 89, 97 (3d Cir. 2011) (considering the decision to grant a gaming license); *Dotzel v. Ashbridge*, 438 F.3d 320, 325 (3d Cir. 2006) (considering an application to conduct gravel pit mining). As with gaming and mining, there is significant money at stake in the decision to approve or deny the sale of a beer in a state.

Accordingly, I conclude that the Commissioners would be subject to numerous damages actions in the absence of absolute immunity.

Finally, I consider whether the Administrative Commissioners' review of a beer registration request provides safeguards to protect the constitutional rights of those involved. It does not. There is no right to a hearing before the initial ruling on a request to register a beer for sale in Michigan. If an application is denied by the Administrative Commissioners, the "applicant may request an appeal hearing, and the commission shall grant the hearing." Mich. Admin. Code R. 436.1925(1). The applicant may be represented by an attorney, Mich. Admin. Code R. 436.1933, but there is no right to present evidence or conduct cross-examination.[2] There is not even a set rule as to whether the applicant or the government has the burden of persuasion: "In a hearing on matters other than a violation of the act or commission rules, the commission may determine which party has the burden of proceeding." Mich. Admin. Code R. 436.1925(4). The number of commissioners that participate in the licensure decision or the appeal is not set by regulation: "The chairperson may designate 1 or more commissioners to hear matters other than a violation of the act or commission rules." Mich. Admin. Code R. 436.1925(3). The regulations do not prohibit the same Administrative Commissioner from participating in both the initial denial and the appeal. Here, Commissioner Weatherspoon participated in the initial denial and then "reviewed" that decision in the appeal. R. 19-2 (Samona Aff. at ¶ 3) (Page ID #178); R. 11-4 (July 7, 2010 Order at 1–2) (Page ID #50–51).

---

[2]Although the Commission has subpoena power to require the attendance of a witness at a hearing, Mich. Admin. Code R. 436.1929(1), given that there is no right to present evidence in a hearing on a matter other than a violation, it is not clear whether the Commission would subpoena a witness for a hearing on an application for a license.

Although there is a right to judicial review of a decision of the Liquor Control Commission, the scope of review in matters where a hearing was not required before the ruling is very limited. The Michigan Constitution provides for judicial review of "[a]ll final decisions . . . of any administrative . . . agency existing under the constitution or by law, which are judicial or quasi-judicial and which affect private rights or licenses." Mich. Const. 1963, art. 6, § 28. The courts review agency decisions where no hearing is required before the initial decision, like Flying Dog's registration request, only under the minimum standard of whether the agency decision "was authorized by law." *J&P Mkt., Inc. v. Liquor Control Comm'n*, 502 N.W.2d 374, 377 (Mich. Ct. App. 1993). In contrast, where a hearing is required, such as when there has been an allegation of a liquor law violation, the courts review the agency's decision both as to whether the decision was "authorized by law" and whether the agency decision was "supported by competent, material and substantial evidence on the whole record." Mich. Const. 1963, art. 6, § 28. "[I]t seems clear that an agency's decision that 'is in violation of statute [or constitution], in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedures resulting in material prejudice, or is arbitrary and capricious,' is a decision that is *not* authorized by law." *Northwestern Nat'l Cas. Co. v. Ins. Comm'r*, 586 N.W.2d 563, 566 (Mich. Ct. App. 1998) (quoting *Brandon Sch. Dist. v. Mich. Ed. Special Servs. Ass'n*, 477 N.W.2d 138, 141 (Mich. Ct. App. 1991)). This standard "focuses on the agency's power and authority to act rather than on the objective correctness of its decision." *Id.*

Together, the inability to present evidence or conduct cross-examination, the fact that the same Administrative Commissioner may participate in the initial denial and the administrative appeal, and the extremely limited review by the state courts demonstrates that the Commissioners'

35

process of reviewing a beer registration request does not provide the typical constitutional safeguards that one would find in a traditional judicial proceeding. *See Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1422 (6th Cir. 1996) (denying quasi-judicial absolute immunity to members of a university grievance committee because the grievance process did not provide safeguards such as a right to cross-examination, right to counsel, or right to subpoena witnesses; the committee was not required to comply with the Tennessee Administrative Procedures Act; and a decision of the committee could be appealed to the university chancellor but not to the courts).

In summary, although the absence of quasi-judicial absolute immunity may lead to many lawsuits for money damages, the facts that the Commissioners do not act in a traditional adjudicatory role and that the registration request process does not provide typical constitutional safeguards, lead me to conclude that the Administrative Commissioners are not entitled to quasi-judicial absolute immunity. For these reasons, I join the majority's judgment to reverse the district court's grant of quasi-judicial absolute immunity to the defendants-appellees.

### III. QUALIFIED IMMUNITY

"Under [the] doctrine [of qualified immunity], courts may not award damages against a government official in his personal capacity unless the official violated a statutory or constitutional right, and the right was clearly established at the time of the challenged conduct." *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (internal quotation marks omitted). Qualified immunity involves a shifting burden:

> The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his

position would have clearly understood that he was under an affirmative duty to refrain from such conduct.

*Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

We are no longer required to consider first, whether a constitutional right was violated and second, whether the constitutional right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009). Although "we have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first," *Ashcroft v. Al-Kidd*, --U.S.--, 131 S. Ct. 2074, 2080 (2011), "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be," *Pearson*, 555 U.S. at 236 (internal quotation marks omitted). Here, our analysis is aided by a precise inquiry into the constitutional right at issue, so I first consider whether a constitutional right was violated, and then determine whether the right was clearly established.

## A. Violation of a constitutional right

The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. 1. Initially, the Supreme Court held that "commercial speech" that advertised a product or service was not entitled to any First Amendment protection. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 384–85 (1973); *Valentine v. Chrestensen*, 316 U.S. 52, 54–55 (1942). However, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976), the Supreme Court changed course, and held that First Amendment protection was warranted even for speech that simply proposed a commercial transaction. The Court explained that the consumer's interest in the "the free flow of commercial information . . . may be as keen, if not keener by far, than his

interest in the day's most urgent political debate." *Id.* at 763. The Court rejected the argument

that commercial speech merited First Amendment protection only when it addressed socially

important or political issues:

> [T]here is another consideration that suggests that no line between publicly 'interesting' or 'important' commercial advertising and the opposite kind could ever be drawn. Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.

*Id.* at 765. Additionally, the Court rejected the paternalistic view that the government needed to

protect people from commercial information:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them."

*Id.* at 770.

A few years later, in *Central Hudson Gas & Electric Corp. v. Public Service Commission*

*of New York ("Central Hudson")*, 447 U.S. 557 (1980), the Supreme Court announced a four-part

test to assess whether government regulation of commercial speech is consistent with the First

Amendment:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566. The Court noted that "[i]n most other contexts, the First Amendment prohibits regulation based on the content of the message." However, the Court concluded that a total prohibition on content-based regulation was not applicable in the commercial speech context because "commercial speakers have extensive knowledge of both the market and their products," and so are "well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity" and because commercial speech "is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Id.* at 564 n.6 (quoting *Bates v. State Bar of Ariz.*, 443 U.S. 350, 381 (1977)).

Although a content-based ban of commercial speech that was truthful and non-misleading was not considered a per se First Amendment violation, in the cases after *Central Hudson* the Supreme Court reiterated that it was the concern about deceptive or misleading information that distinguished judicial review of commercial speech regulation from other content-based regulation. "[R]egulation of commercial speech based on content is less problematic. In light of the greater potential for deception or confusion in the context of certain advertising messages, content-based restrictions on commercial speech may be permissible." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983) (internal citation omitted). Indeed, several members of the Supreme Court suggested that it was inconsistent with First Amendment principles to apply only intermediate scrutiny for content-based regulation of non-misleading commercial speech:

> When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review. However, when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons

> unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands. . . .
>
> It is the State's interest in protecting consumers from commercial harms that provides the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech. Yet bans that target truthful, nonmisleading commercial messages rarely protect consumers from such harms. Instead, such bans often serve only to obscure an underlying governmental policy that could be implemented without regulating speech. In this way, these commercial speech bans not only hinder consumer choice, but also impede debate over central issues of public policy.

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501–03 (1996) (joint opinion of Stevens, Kennedy, and Ginsburg, JJ.) (internal quotation marks and citations omitted). Citing *44 Liquormart*, the Court twice acknowledged a litigant's request to apply strict scrutiny in a commercial speech challenge but stated that "[w]e see 'no need to break new ground. *Central Hudson*, as applied in our more recent commercial speech cases, provides an adequate basis for decision.'" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554–55 (2001) (quoting *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184 (1999)). In both cases, the Court held that the challenged statute violated the First Amendment.

Approximately one year after the Commissioners denied Flying Dog's appeal, the Supreme Court decided *Sorrell v. IMS Health, Inc.*, --U.S.--, 131 S. Ct. 2653 (2011). *Sorrell* involved a challenge to a Vermont law regulating the sale, disclosure, and marketing of pharmacy records that revealed information about the prescribing practices of individual doctors; the regulatory scheme permitted the sale of the information to researchers, but prohibited the disclosure or use of the information by pharmaceutical representatives for marketing. The Court held that the law was "designed to impose a specific, content-based burden on protected expression. It follows that *heightened judicial scrutiny* is warranted." *Id.* at 2664 (emphasis

added).   The State argued that the ordinary rule that content-based and viewpoint-discriminatory

regulation is presumptively invalid should not apply to commercial speech.  *Id.* at 2667.   The

Court noted that "[a]s in previous cases . . . the outcome is the same whether a special commercial

speech inquiry or a stricter form of judicial scrutiny is applied" and then proceeded to apply the

*Central Hudson* test:   "[t]o sustain the targeted, content-based burden [the law] imposes on

protected expression, the State must show at least that the statute directly advances a substantial

governmental interest and that the measure is drawn to achieve that interest," *id.* at 2667–68,

ultimately holding that the Vermont law did not satisfy that test.   Thus, although *Sorrell* stated

that "heightened judicial scrutiny" applied, it reaffirmed the use of the *Central Hudson* test and

simply acknowledged the reality that content-based speech regulation will rarely satisfy the test.[3]

I agree with the district court that the "Raging Bitch" label is properly categorized as

commercial speech.   Commercial speech has been described as "expression related solely to the

economic interests of the speaker and its audience" and "speech proposing a commercial

transaction."   *Central Hudson*, 447 U.S. at 561, 562.   I agree with the Tenth Circuit's conclusion

that a product label that is "part of a firm's marketing plan to provide certain information to the

consumer," may constitute commercial speech.  *Adolph Coors. Co. v. Brady*, 944 F.2d 1543,

1546 (10th Cir. 1991).   Similarly, the Second Circuit held that an image on a beer bottle label

constituted commercial speech because the image "is reasonably understood as attempting to

---

[3] Although *Sorrell* does not significantly change my analysis of commercial speech regulation, because *Sorrell* was issued after the Commissioners denied Flying Dog's registration request, I do not consider the case in determining whether Flying Dog's constitutional right to engage in the banned speech was clearly established.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful.").

identify to consumers a product of the Bad Frog Brewery. In addition, the label serves to propose a commercial transaction." *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 96 (2d Cir. 1998) (footnote omitted). Flying Dog argues that the "Raging Bitch" label was not commercial speech because the label was not simply a means to sell the product, but it also "communicates Flying Dog's 'gonzo' message, and contains significant independent artistic and literary expression" and the commercial aspects of the speech are "'inextricably intertwined with otherwise fully protected speech.'" Appellant Br. at 37, 39 (quoting *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988)). Because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied," *Sorrell*, 131 S. Ct. at 2667, whether the "Raging Bitch" label is both commercial and artistic makes no difference.

Therefore, I note that "[i]n the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory," *Sorrell*, 131 S. Ct. at 2667, and proceed to apply the *Central Hudson* test to determine whether the Commissioners' denial of Flying Dog's registration request because of the "Raging Bitch" label violated the First Amendment.

First, I consider whether the "Raging Bitch" label is speech that "is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." *Central Hudson*, 447 U.S. at 566. The Commissioners concede that the "Raging Bitch" label is not misleading and does not concern unlawful activity. Appellee Br. at 47. Accordingly, the label is protected by the First Amendment.

Second, I consider whether the governmental interests that the speech regulation was intended to advance are substantial. *Central Hudson*, 447 U.S. at 566. In their brief in this court,

the Commissioners asserted that the denial of Flying Dog's request was justified by substantial state interests in "protecting the physical and psychological well-being of minors," "regulating alcohol consumption and promoting temperance," and "protecting the health, safety, and welfare of [Michigan] citizens." Appellee Br. at 47–48. Flying Dog, however, contends that these asserted state interests are not the real reasons that the Commissioners rejected the "Raging Bitch" registration request; Flying Dog argues that the Commissioners actually rejected the request because they thought that the "Raging Bitch" label was "offensive, repulsive, possibly obscene, and likely to incite violence" as well as "edgy" and because the label "promotes sexism." Reply Br. at 4–5 (internal quotation marks and citations omitted). The Commissioners' rationale for denying Flying Dog's request has shifted and expanded from the initial denial through the course of litigation; the lack of a consistent, coherent explanation of why the Commissioners rejected the label supports Flying Dog's argument. Accordingly, I recap the many explanations the Commissioners have given for their decision to reject Flying Dog's registration request.

Flying Dog's request was denied in a written order dated November 18, 2009, citing then-applicable Michigan Administrative Code Rule 436.1611(1)(d), which provided that "[t]he commission may disapprove any beer label submitted for registration that is deemed to promote violence, racism, sexism, intemperance, or intoxication or to be detrimental to the health, safety, or welfare of the general public," and stating that "[t]he Commission finds that the proposed label which includes the brand name 'Raging Bitch' contains such language deemed detrimental to the health, safety, or welfare of the general public." R. 11-2 (Nov. 18, 2009 Order at 1) (Page ID #28).

During the April 22, 2010 appeal hearing, Commissioner Gagliardi's comments suggest that he was concerned that the "Raging Bitch" label was offensive. He stated that when the Commissioners were in the "gray area" between edgy and offensive, they "attempt to err on the side of the least offensive." R. 11-3 (Appeal Tr. at 16 (Page ID #44). It is reasonable to infer from this statement that Commissioner Gagliardi's decision to reject Flying Dog's registration request was based, at least in part, on a concern that the "Raging Bitch" label was offensive. This is troubling because eliminating offensive speech is clearly not a substantial state interest. "'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'" *Snyder v. Phelps*, --U.S.--, 131 S. Ct. 1207, 1219 (2011) (quoting *Tex. v. Johnson*, 491 U.S. 397, 414 (1989)).

Flying Dog's appeal was denied in a written order dated July 7, 2010, and signed by Commissioners Gagliardi and Weatherspoon. This order stated that the Commission initially denied the request at a November 18, 2009, meeting "after review and consideration of the proposed label which includes language deemed detrimental to the health, safety, or welfare of the general public due to *the promiscuous nature of the product label*." R. 11-4 (July 7, 2010 Order at 1) (Page ID #50) (emphasis added). This summary is inconsistent with the November 18, 2009 written order, which did not mention any concern about the label having a "promiscuous nature." Additionally, the Commissioners never explain how an inanimate object such as a product label could have a "promiscuous nature." The appeal denial then summarized the April 22, 2010 hearing and concluded that the Commission "continues to find that the label in question contains such language deemed detrimental to the health, safety, or welfare of the general public and the

44

basis of denial as set forth in its order of November 18, 2009 is justified." *Id.* at 1–2 (Page ID #50–51). Therefore, the Commission affirmed the denial of Flying Dog's "request to register 'Raging Bitch' Belgian-style India Pale Ale for sale in the State of Michigan." *Id.* at 2 (Page ID #51).

The Commissioners' motions and briefs filed in the federal district court only further the confusion. The Commissioners' brief opposing Flying Dog's motion for a preliminary injunction asserted that:

> The State has "a compelling interest in protecting the physical and psychological well-being of minors," including "shielding minors from the influence of literature that is not obscene by adult standards.["] Additionally, Michigan has a substantial interest in regulating alcohol consumption and promoting temperance. The State's interest in protecting the health, safety, and welfare of its citizens also rises to the level of satisfying the second *Central Hudson* factor.

R. 18 (Brief in Opp. to Mot. for Prelim. Inj. at 7) (Page ID #114) (footnotes omitted). This brief was the first time that the Commissioners mentioned obscenity with reference to the "Raging Bitch" label; however, it is not clear whether the Commissioners were simply quoting from a case regarding a state interest in protecting children from obscene literature, or whether the Commissioners intended to suggest that the "Raging Bitch" label is obscene. The Commissioners also do not explain what they mean by "promoting temperance." Historically, the temperance movement was a women's movement that advocated for a national prohibition on alcohol due to the perceived social ills and unrest caused by alcohol consumption. *See* Richard H. Chused, *Courts and Temperance "Ladies*,*"* 21 Yale J.L. & Feminism 339 (2010). The passage of the Twenty-First Amendment to the Constitution suggests that the state no longer has a substantial interest in promoting temperance. Our sister circuits have recognized a substantial state interest

in promoting temperance where that interest is broadly defined as the promotion of moderate consumption by adults and abstention by underage individuals, and the discouraging of the dangerous consequences of alcohol consumption such as alcoholism and drunk driving. *See Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1069 & n.3 (10th Cir. 2001); *Bad Frog Brewery, Inc.*, 134 F.3d at 98. Here, though, the Commissioners do not elaborate on why the state has an interest in promoting temperance.

The defendants-appellees submitted an affidavit from Chairperson Samona dated May 5, 2011 with their brief opposing Flying Dog's motion for a preliminary injunction. Chairperson Samona participated in the initial denial of Flying Dog's request, and her affidavit provided a whole new set of reasons that the Commissioners denied Flying Dog's request. Chairperson Samona averred that she and Commissioner Weatherspoon denied Flying Dog's initial request because "the name, text and the drawing on the label, taken as a whole, promotes sexism and is detrimental to the health, safety, or welfare of the general public under R 436.1611(1)(d)." R. 19-2 (Samona Aff. at ¶ 3) (Page ID #178). This statement is troubling for two reasons. First, the written orders from the Commission stated that the registration request was denied because of the language on the label, not the drawing.[4] *See* R. 11-2 (Initial Order at 1) (Page ID# 28); R. 11-4 (Appellate Order at 1) (Page ID# 50). Second, Chairperson Samona's statement that she and Commissioner Weatherspoon denied Flying Dog's request because the label promoted sexism is

---

[4]Chairperson Samona mentioned the drawing multiple times in her affidavit. She averred that the label "caricaturizes a wild female dog to portray women as wild animals that must be tamed. The female dog has her behind exposed with her vagina showing, clearly illustrated and facing the viewer." R. 19-2 (Samona Aff. at ¶ 4) (Page ID# 178). Chairperson Samona also averred that "[w]e have approved nearly 20 other labels from Flying Dog Brewery and none of those labels had any drawings of human genitalia." *Id.* at ¶ 14 (Page ID# 179).

not consistent with the November 18, 2009 written order denying Flying Dog's request.[5] The November 18, 2009 written order stated that the Commissioners denied Flying Dog's request because they concluded that the label was "detrimental to the health, safety, or welfare of the general public," not because they found that the label promoted sexism.[6] R. 11-2 (Nov. 18, 2009 Order at 1) (Page ID #28); Mich. Admin. Code R. 436.1611(1)(d) (2004) ("The Commission may disapprove any beer label submitted for registration that is deemed to *promote* racism, *sexism*, intemperance, or intoxication or to be detrimental to the health, safety, or welfare of the general public) (emphasis added). Additionally, Chairperson Samona causes concern with her repeated description of the "Raging Bitch" label as "offensive."[7] As with Commissioner Gagliardi's

---

[5]The "Raging Bitch" label's promotion of sexism was a consistent theme in Chairperson Samona's affidavit. In addition to her statement that she and Commissioner Weatherspoon denied Flying Dog's request because the label promoted sexism, she averred that "the name and label text promote sexist treatment and objectification of women," *id.* at ¶ 11 (Page ID #179), and that

> "Raging Bitch" is a gender-specific insult, used to denigrate women by classifying them as less than human. This label condones and promotes a social hierarchy based on sex and may incite rage. It is an offensive, stereotypical, sexist, derogatory, and demeaning portrayal of women.

*Id.* at ¶ 5) (Page ID #178).

[6]We interpret statutes and regulations "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous." *Lake Cumberland Trust, Inc. v. E.P.A.*, 954 F.2d 1218, 1222 (6th Cir. 1992). Accordingly, to ensure that the "promotes sexism" prong of the labeling regulation is not rendered superfluous, we must interpret it to mean something other than "detrimental to the health, safety, or welfare of the general public."

[7] Chairperson Samona described the label as "an offensive, stereotypical, sexist, derogatory, and demeaning portrayal of women," R. 19-2 (Samona Aff. at ¶ 5) (Page ID #178), and averred that "[c]hildren frequent many of [the retail liquor sales] locations and would be exposed to this highly offensive and degrading product name, label, and narrative if approval is allowed," *id.* at ¶ 11 (Page ID #179).

statement about erring on the side of the least offensive during the April 22, 2010 appeal hearing, Commissioner Samona bases her denial of Flying Dog's registration request, at least in part, on her personal belief that the "Raging Bitch" label was offensive.

Finally, in their brief to this court, the Commissioners identify substantial state interests in "protecting the physical and psychological well-being of minors," "regulating alcohol consumption and promoting temperance," and "protecting the health, safety, and welfare of [Michigan] citizens." Appellee Br. at 47–48. These asserted interests mirror those stated in the Commissioners' brief opposing Flying Dog's motion for a preliminary injunction in the district court, with the slight change that the Commissioners no longer mention obscenity with respect to the interest in children's well-being. *See* R. 18 (Brief in Opp. to Mot. for Prelim. Inj. at 7) (Page ID #114).

The Commissioners' shifting explanations raise the question whether the asserted state interests were at the forefront of the Commissioners' minds when they rejected Flying Dog's request, or whether they are post-hoc rationalizations developed for the federal courts. The Commissioners' own statements—Commissioner Gagliardi in the appeal hearing and Chairperson Samona in her affidavit—provide strong support for Flying Dog's argument that its request was rejected for a clearly unconstitutional reason. However, this court need not resolve whether the asserted state interests are pretextual, or whether they are substantial, because even assuming that the state interests asserted in the Commissioners' brief to this court are the real state interests, and that those state interests are substantial, I nevertheless would conclude that the rejection of Flying Dog's registration request was unconstitutional. Accordingly, I assume, without deciding, that

the rejection of Flying Dog's request because of the "Raging Bitch" label satisfies the second *Central Hudson* prong.

Chairperson Samona's affidavit suggests that she was troubled by the illustration on the "Raging Bitch" label as well as the product name and text. The Commissioners argue that the illustration on the "Raging Bitch" label makes clear that the word "bitch" refers to a human woman, not a dog, Appellee Br. at 50, but the Commissioners' brief focuses on the harm caused by the sight of the word "bitch," not the illustration. Appellee Br. at 48–49 (discussing the history of the term "bitch"); Appellee Br. at 50 ("Advocates against violence toward women also recognize the harm that this language can cause"); Appellee Br. at 51–52 ("Combining harmful terms with a judgment-impairing product would make it even easier to harm women"); Appellee Br. at 52 (distinguishing this situation from *Bad Frog Brewery* "where the product did not even have a vulgar, harmful name"). Accordingly, I take the Commissioners at their word and focus review on the constitutionality of the denial of Flying Dog's registration request because the label contained the phrase "Raging Bitch."

The last two steps of the *Central Hudson* analysis are generally performed in tandem and "involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341 (1986). The third prong considers whether the Commissioners' rejection of Flying Dog's registration request for the "Raging Bitch" label directly advanced the asserted state interests, and the fourth prong considers whether the speech prohibition was not more extensive than necessary to serve the state interest. Because the Commissioners present no evidence, whatsoever, that observing the phrase "Raging Bitch" on the label of a beer bottle would increase

alcohol consumption, harm the physical and psychological well-being of minors, or pose a danger to the safety, health, and welfare of Michigan citizens, the Commissioners do not show that their suppression of the "Raging Bitch" label directly advanced the asserted state interests, and so do not satisfy the third *Central Hudson* prong. Because the speech prohibition does not advance the asserted state interests, the ban was far more extensive than necessary, and thus the Commissioners do not satisfy the fourth *Central Hudson* prong.

The Commissioners do not even attempt to explain how rejecting the Flying Dog registration request based on the content of the label furthers the state interest in regulating alcohol consumption and promoting temperance. Of course, the prohibition on the sale of "Raging Bitch" in Michigan reduced consumption of that particular beer, but there is no evidence that banning the "Raging Bitch" label decreased overall alcohol consumption. *See Bad Frog Brewery*, 134 F.3d at 100 (holding that a rejection of a registration request for a beer because of the content of the label did not advance a state interest in temperance and moderate alcoholic consumption; although the label depicted an offensive gesture, "[w]hether viewing that gesture on a beer label will encourage disregard of health warnings or encourage underage drinking remain matters of speculation."). Accordingly, in no way have the Commissioners shown that the "Raging Bitch" ban directly advances a state interest in regulating alcohol consumption and promoting temperance.

The Commissioners present a historical, linguistic, and sociological argument that the term "bitch" is "a derogatory defamation of sex and gender" and that living in a society where "bitch" and other words are used "to put women down . . . sends a message that females are less than fully human" and "[w]hen we see women as inferior, it becomes easier to treat them with less respect, disregard their rights, and ignore their well-being." Appellee Br. at 49–51. Certainly the word

"bitch" is frequently used as a slur against powerful women and against men who do not perform a traditional masculine gender role, and being called a "bitch" by a person in a position of power can be emotionally harmful. *See, e.g.*, Jill Filipovic, *Blogging While Female: How Internet Misogyny Parallels 'Real-World' Harassment*, 19 Yale J.L. & Feminism 295 (2007) (recounting the use of "bitch" as a slur against feminist activists, musicians, and politicians); *Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012) (collecting hostile work-environment cases involving "bitch" as a gender-specific insult); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) (en banc) ("It is undeniable that the terms 'bitch' and 'whore' have gender-specific meanings. Calling a man a 'bitch' belittles him precisely because it belittles women. It implies that the male object of ridicule is a lesser man and feminine, and may not belong in the workplace. Indeed, it insults the man by comparing him to a woman, and, thereby, could be taken as humiliating to women as a group as well."). However, "[t]hat the [Commissioners'] asserted interests are substantial in the abstract does not mean . . . that its blanket prohibition [of the label] serves them." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). The Commissioners did not ban the use of "bitch" as a slur in interpersonal communication (nor does this opinion comment on whether doing so would be constitutional). The Commissioners banned the "Raging Bitch" label. Therefore, the relevant question is whether the Commissioners have shown that barring Flying Dog from placing the "Raging Bitch" label in front of the adults and children of Michigan directly advanced state interests in protecting the physical and psychological well-being of minors or protecting the safety, health, and welfare of Michigan citizens? The answer is a resounding no.

51

The third *Central Hudson* prong "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. "[T]he government must come forward with some quantum of evidence, beyond its own belief in the necessity for regulation[.]" *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) (en banc). The Commissioners provide no evidence that seeing the phrase "Raging Bitch" written on the label of a beer bottle harms the physical and psychological well-being of minors, or poses a danger to the safety, health, and welfare of Michigan citizens. One cannot assume that the emotional harm that may be caused by being called a "bitch" by someone in a position of authority, such as an employer, is also caused by seeing the word "bitch" in writing on the label of a beer bottle while strolling through the grocery store aisles or casting a glance at a neighboring table in a restaurant where "Raging Bitch" is served in bottles. These are completely different situations; in the former, there is human interaction and conduct and in the latter, only a word. It is context that gives words meaning, and therefore power. If the sight of the "Raging Bitch" label causes no harm, then banning the label did not advance the asserted state interests. This conclusion is consistent with our decision in *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686, 695 (6th Cir. 1981), where we held that a city's revocation of a restaurant's permit to display the name "Sambo's" violated the First Amendment. The government "produced no evidence to demonstrate that the actual operation of the restaurant under the name 'Sambo's' has retarded or impeded achievement or furtherance of its goal o[f] racial equality . . . The impact on these laudable goals by 'Sambo's' is speculative at best. Much more than a speculative ca[u]sal relationship is required."

To the extent that the Commissioners argue that the danger posed by the "Raging Bitch" label is violence against women, their own argument defeats a conclusion that the ban directly advanced that state interest. The Commissioners suggest that because alcohol has the "potential to lead to irrational and destructive behavior," "[c]ombining harmful terms with a judgment-impairing product *would make it even easier* to harm women." Appellee Br. at 51–52 (emphasis added). But the Commissioners do not argue that seeing the "Raging Bitch" label itself would *actually* cause violence against women; the Commissioners are explicit that they did not reject Flying Dog's registration request because they thought the "Raging Bitch" label would incite violence. Appellee Br. at 28–29. Doubtless routine exposure to the use of "bitch" as an insult can contribute to sexist attitudes that, in turn, contribute to violence against women, but this is an attenuated causal chain with many opportunities for human agency to break the links. And again, the Commissioners do not present any evidence that the passive observation of the "Raging Bitch" beer label has the same negative impact as being exposed to "bitch" as a personal slur. As the Court noted in the context of a First Amendment challenge to a flag-burning conviction, "[t]he way to preserve the flag's special role is not to punish those who feel differently . . . It is to persuade them that they are wrong." *Johnson*, 491 U.S. at 419. Here, the constitutional government response to the concern about the consequences of seeing the word "bitch" is to open up a conversation about the impact of language on society, not to repress speech. Having failed to show that looking at the "Raging Bitch" label causes violence against women, the Commissioners have not shown that banning the label directly advanced their state interests.

Even if the sight of the phrase "bitch" was injurious to the physical and psychological well-being of minors, or posed a danger to the safety, health, and welfare of Michigan citizens,

53

given the pervasive nature of the term "bitch" in society, the Commissioners' ban on the "Raging Bitch" label or even on the word "bitch" from all liquor labels has little impact on overall exposure to the word. In a very similar case, the Second Circuit held that the New York State Liquor Authority's (NYSLA) rejection of a brewery's application for brand label approval and registration due to the image of a frog with a raised middle finger on the label[8] did not directly advance the state interest in protecting children from vulgarity:

> In the pending case, NYSLA endeavors to advance the state interest in preventing exposure of children to vulgar displays by taking only the limited step of barring such displays from the labels of alcoholic beverages. In view of the wide currency of vulgar displays throughout contemporary society, including comic books targeted directly at children, barring such displays from labels for alcoholic beverages cannot realistically be expected to reduce children's exposure to such displays to any significant degree.

*Bad Frog Brewery*, 134 F.3d at 99 (footnote omitted); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995) (holding that a prohibition on displaying alcohol content on beer labels, while permitting alcohol content to be included in beer advertisements, did not advance a state interest in preventing brewers from competing on the basis of strength of product; banning the information in one forum and permitting it in another, arguably more persuasive, forum demonstrated the "overall irrationality of the Government's regulatory scheme," and that the speech ban did not directly and materially advance the government interest). Flying Dog points to examples of the word "bitch" in the titles of a knitting guide (*Stitch 'n Bitch*), a feminist

---

[8]Specifically, the label "prominently features an artist's rendering of a frog holding up its four-'fingered' right 'hand,' with the back of the 'hand' shown, the second 'finger' extended, and the other three 'fingers' slightly curled . . . Bad Frog does not dispute that the frog depicted in the label artwork is making the gesture generally known as 'giving the finger' . . . Versions of the label feature slogans such as 'He just don't care,' 'An amphibian with an attitude,' 'Turning bad into good,' and 'The beer so good . . . it's bad.' Another slogan, originally used but now abandoned, was 'He's mean, green and obscene.'" *Bad Frog Brewery, Inc.*, 134 F.3d at 90–91.

magazine (*Bitch Magazine*), a popular novel (*The Bitch* by Jackie Collins), and a jazz album (*Bitches Brew* by Miles Davis). Appellant Br. at 24, 26. There is no evidence that the Michigan government has prohibited these items from appearing in Michigan stores. Certainly the Commissioners do not have the authority to regulate books, television broadcasting, or music. Nonetheless, that does not give the Commissioners free rein to exercise the limited authority that they do possess to regulate speech, unless their regulation directly advances a substantial state interest in a manner that is not more extensive than necessary. Again, *Bad Frog Brewery* is instructive:

> We appreciate that NYSLA has no authority to prohibit vulgar displays appearing beyond the marketing of alcoholic beverages, but a state may not avoid the criterion of materially advancing its interest by authorizing only one component of its regulatory machinery to attack a narrow manifestation of a perceived problem. . . . [New York's] currently isolated response to the perceived problem, applicable only to labels on a product that children cannot purchase, does not suffice. We do not mean that a state must attack a problem with a total effort or fail the third criterion of a valid commercial speech limitation. Our point is that a state must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from a beach of vulgarity.

*Bad Frog Brewery, Inc.*, 134 F.3d at 99–100 (footnote and internal citation omitted). The idiosyncratic nature of the Commissioners' ban on the word "bitch" suggests that the prohibition reflected the Commissioners' particular policy concerns, not the substantial interests of the State of Michigan. The Commissioners emphasize that they have "repeatedly rejected the use of 'bitch' on beer and wine labels" as evidence that the ban directly advances a state interest. Appellee Br. at 52. But the issue is not whether there has been a blanket ban on "bitch" in the Michigan liquor aisles; it is whether preventing Michigan citizens from seeing the word "bitch" on beer labels actually advances a state interest. It does not. The fact that the Commissioners may

have violated the First Amendment on more than this occasion does not aid their argument.

I conclude that the rejection of Flying Dog's registration request because of the "Raging Bitch" label did not directly advance the asserted state interests in protecting of the physical and psychological well-being of minors, regulating alcohol consumption and promoting temperance, and protecting the safety, health, and welfare of Michigan citizens. Accordingly, the ban of the "Raging Bitch" label does not satisfy the third *Central Hudson* prong.

Because the speech ban did not directly advance the asserted state interests, the total prohibition on the "Raging Bitch" label is necessarily far more extensive than necessary to serve the state interests. The fit requirement "ensures[s] not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message." *Sorrell*, 131 S. Ct. at 2668. This standard "requires something short of a least-restrictive-means standard." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). "What our decisions require is a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective." *Id.* at 480 (internal citations and quotation marks omitted). Because the Commissioners have not demonstrated that the "Raging Bitch" ban serves the asserted state interests at all, the ban is wholly out of proportion with the ends supposedly served.

The Commissioners argue that because the "Raging Bitch" label harms adults and children alike, a total ban on the label was the narrowest means by which they could further the asserted

state interests. This argument is based in the Commissioners' concern that the citizens of Michigan could not avoid seeing the "Raging Bitch" label if the beer was approved for sale:

> Flying Dog asked for permission to place this product before Michigan's public, including its children, in grocery and convenience stores, where it would not be confined to liquor aisles. Retailers may place alcohol for sale wherever they wish, including right next to cash registers, along with the candy. Additionally, beer bottles may be sold in restaurants where customers who choose this product dine near those who would rather avoid it.

Appellee Br. at 49–50. The Commissioners argue that the "captive audience doctrine" justifies the total prohibition on the "Raging Bitch" label, given that "an everyday shopper or restaurant customer would have no meaningful opportunity to avoid Raging Bitch." Appellee Br. at 53.

The captive audience doctrine recognizes that "[w]hile th[e] [Supreme] Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, we have at the same time consistently stressed that we are often captives outside the sanctuary of the home and subject to objectionable speech." *Cohen v. Cal.*, 403 U.S. 15, 21 (1971). However, "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that *substantial privacy interests are being invaded in an essentially intolerable manner*. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Id.* (emphasis added) (overturning a conviction for disturbing the peace predicated on defendant walking through a courtroom corridor wearing a jacket emblazoned with the phrase "Fuck the Draft").

I am not persuaded that grocery-store shoppers and restaurant diners are "captive" to the message of the "Raging Bitch" label. There is no evidence that the co-mingling of candy and craft beer is a real occurrence, as opposed to a hypothetical fear. Additionally, it seems unlikely that every grocery store and restaurant in Michigan will choose to sell "Raging Bitch"; presumably, one could avoid seeing the label by not patronizing locations where "Raging Bitch" is sold. But most importantly, the captive audience doctrine does not aid the Commissioners because seeing a beer bottle label in a grocery store or a restaurant does not invade "substantial privacy interests . . . in an essentially intolerable manner." *Cohen*, 403 U.S. at 21. *Compare Snyder*, 131 S. Ct. at 1220 (2011) (declining to extend captive-audience doctrine to an outdoor protest at a funeral), *with Frisby v. Schultz*, 487 U.S. 474, 484–85 (1988) (upholding a statute that prohibited picketing around a residence); *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) (upholding the Federal Communication Commission's order restricting the broadcasting of George Carlin's "Filthy Words" monologue[9] to times when children were unlikely to be awake and listening to the radio; emphasizing that the medium of radio broadcast "confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder."); *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 736–38 (1970) (upholding a statute that allows homeowners to block delivery of offensive mail to their homes). "In most circumstances, 'the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to

_____

[9]The "Filthy Words" monologue "began by referring to [Carlin's] thoughts about 'the words you couldn't say on the public, ah, airwaves, um, the ones you definitely wouldn't say, ever.' He proceeded to list those words and repeat them over and over again in a variety of colloquialisms." *Pacifica Foundation*, 438 U.S. at 729. Carlin stated "bitch" twice. *Id.* at 751.

require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes.'" *Snyder*, 131 S. Ct. at 1220 (*quoting Erznoznik v. Jacksonville*, 422 U.S. 205, 210–11 (1975)). Because permitting "Raging Bitch" to appear in grocery stores, convenience stores, and restaurants does not invade "substantial privacy interests . . . in an essentially intolerable manner," the captive audience doctrine does not support the Commissioners' argument that a total ban on the "Raging Bitch" label was not more extensive than necessary. Because the "Raging Bitch" label ban was far more extensive than necessary to serve the asserted state interests, the ban does not satisfy the fourth *Central Hudson* prong.

In the commercial marketplace, "[s]ome of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield*, 507 U.S. at 767. For the foregoing reasons, I conclude that the rejection of Flying Dog's registration request because of the content of the "Raging Bitch" label violated Flying Dog's First Amendment rights.

**B. The First Amendment Right Was Clearly Established**

A government official is liable for the violation of a constitutional right if "'the right was clearly established . . . in light of the specific context of the case.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)). "A right is clearly established if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The "clearly established" inquiry "'must be undertaken in light of the specific context of the case, not as a broad

general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "'In an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law.'" *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083. "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012).

The First Amendment presents a powerful background prohibition on government interference with speech, with limited exceptions. *Leonard v. Robinson*, 477 F.3d 347, 356–57 (6th Cir. 2007). Government officials may regulate truthful, non-misleading commercial speech only if the regulation directly advances a substantial state interest and the regulation is not more extensive than is necessary to serve that interest. *Central Hudson*, 447 U.S. at 565. Total bans on speech that is neither false nor misleading based on the content of the speech have not fared well under the *Central Hudson* test. *See, e.g., Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) (holding that a ban on advertising the compounding of pharmaceuticals violated the First Amendment); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (holding that a ban on outdoor advertising of smokeless tobacco and cigars within one thousand feet of a school or playground violated the First Amendment); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) (holding that a ban on advertising private casino gambling over the radio and on television in states where such gambling was legal violated the First Amendment); *44 Liquormart,*

*Inc.*, 517  U.S. 484 (1996) (holding that a ban on advertising the alcohol content of malt beverages violated the First Amendment); *Rubin*, 514 U.S. 476 (1995) (holding that a ban on including alcohol content on a beer label violated the First Amendment); *Edenfield*, 507 U.S. 761 (1993) (holding that a ban on CPA solicitation of clients violated the First Amendment); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) (holding that a ban on newsracks used to display commercial handbills violated the First Amendment); *Bolger*, 463 U.S. 60 (1983) (holding that a prohibition on mailing unsolicited advertisements for contraception violated the First Amendment); *cf. Posadas de Puerto Rico Assocs.*, 478 U.S. 328 (1986) (holding that a regulatory scheme that limited, but did not wholly prohibit, advertising casino gambling did not violate the First Amendment).   The consistent failure of content-based bans of truthful, non-misleading commercial speech reflects "the presumption that the speaker and the audience, not the Government, should be left to assess the value of accurate and nonmisleading information about lawful conduct."   *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 195.   This strong series of Supreme Court precedent was more than adequate to inform a government official that enacting a total ban of truthful, non-misleading commercial speech based on the content of the speech violates the First Amendment.

Even if this ample precedent were not enough to put the constitutional question "beyond debate," *al-Kidd*, 131 S. Ct. at 2083, the very requirements of the *Central Hudson* test should have put the Commissioners on notice that their conduct was unconstitutional.   The First Amendment protects the right to engage in commercial speech free from government suppression that does not directly advance a state interest and is not tailored to be no more extensive than necessary.   The Commissioners have no evidence—anecdotal, empirical, or otherwise—that the sight of the

"Raging Bitch" label would harm the citizens of Michigan. No reasonable government official could believe that it was constitutional to ban speech that was not harmful to any substantial state interest. "Qualified immunity extends to government officials' objectively reasonable mistakes." *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012). It does not immunize government officials from the expectation that they at least consider the constitutionality of their actions.

The Commissioners argue that the Second Circuit's grant of qualified immunity to the state commissioners in *Bad Frog Brewery* demonstrates that the law in this area is not clearly established. In *Bad Frog Brewery*, the district court held that the rejection of the Bad Frog label was not a constitutional violation; the Second Circuit reversed that determination but concluded that "[t]he District Court's decision upholding the denial of the application, though erroneous in our view, sufficiently demonstrates that it was reasonable for the commissioners to believe that they were entitled to reject the application." *Bad Frog Brewery*, 134 F.3d at 102. Here, in contrast, the district court did not address whether the rejection of the "Raging Bitch" label was a constitutional violation. Moreover*, Bad Frog Brewery* was decided in 1998, well before the events at issue in this case. The Second Circuit held that the rejection of the Bad Frog Brewery label was unconstitutional because the state officials had no evidence that the speech ban actually advanced a state interest—the very same reason that the Commissioners' rejection of the "Raging Bitch" label fails here. *Bad Frog Brewery* does not demonstrate the unsettled nature of the right at issue; it demonstrates that the Commissioners' conduct was clearly unconstitutional.

Because it was clearly established that the suppression of the "Raging Bitch" label violated Flying Dog's First Amendment rights, I conclude that the Commissioners are not entitled to qualified immunity.

## IV.  CONCLUSION

For the reasons explained above, I would reverse both the district court's grant of quasi-judicial immunity and its grant of qualified immunity to Chairperson Samona and Commissioners Weatherspoon and Gagliardi.   Because there are no material disputes of fact and Flying Dog is entitled to judgment as a matter of law, I would reverse the district court's denial of Flying Dog's motion for partial summary judgment and would remand to the district court for further proceedings simply to determine the amount of Flying Dog's damages consistent with this opinion.

# APPENDIX

